## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## PINE BLUFF DIVISION

PATRIC PATTERSON                                                    PLAINTIFF
ADC #107498

V.                              5:15CV00075 JLH/JTR

WENDY KELLEY,
Deputy Director, ADC, et al.                                       DEFENDANTS


## RECOMMENDED DISPOSITION

The following Recommended Disposition ("Recommendation") has been sent

to United States District Judge J. Leon Holmes. You may file written objections to all

or part of this Recommendation. If you do so, those objections must: (1) specifically

explain the factual and/or legal basis for your objection; and (2) be received by the

Clerk of this Court within fourteen (14) days of this Recommendation. By not

objecting, you may waive the right to appeal questions of fact.

### I. Introduction

In this *pro se* § 1983 action, Plaintiff, Patric Patterson ("Patterson") alleges that,

while he was incarcerated in the Varner Unit of the Arkansas Department of

Correction ("ADC"), Defendants Kennie Bolden, Jeremy Andrews, Lt. Willie

Bankston, Richard Mazzanti, Sgt. Christie Simpson, and Capt. Anthony Bradley

1

(hereinafter referred to collectively as "the Defendants"), violated his constitutional rights by failing to protect him from being attacked by another prisoner on March 16, 2014.[1] *Doc. 1.*

Defendants have filed a Motion for Summary Judgment, a Brief in Support, and a Statement of Undisputed Facts.[2] *Docs. 71, 72 & 73.* Patterson has filed a Response. *Doc. 77.*

Before reaching the merits of Defendants' Motion for Summary Judgment, the Court will review the relevant undisputed facts giving rise to Patterson's claims:

1.      In March of 2014, Patterson was housed in Barracks 13, Zone 2 in the Varner Unit. This is an "open barracks" and, at that time, it housed approximately 54 inmates. *Doc. 71, Ex. D at 35 & 43; Ex. E ¶ 3.*

2.      Inmate Michael Black was also housed in Barracks 13. Although

---

[1]The Court has previously dismissed, *without prejudice,* Patterson's claims against Defendants Wendy Kelley and Randy Watson. The dismissal of those claims was based on Patterson's failure to exhaust his administrative remedies as required by ADC regulations and the Prison Litigation Reform Act ("PLRA"). *Docs. 53 & 54.*

[2]Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex,* 477 U.S. at 323. Once that has been done, the nonmoving party must present specific facts demonstrating that there is a material dispute for trial. *See* Fed. R. Civ. P. 56(c); *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir. 2011).

Patterson and Black both lived in Barracks 13, they "did not associate with one another." *Id., Ex. D at 36; Doc. 77 at 68.*

3.     At the time of the March 16, 2014 attack, Patterson knew that the ADC had a procedure that allowed prisoners to list other inmates on their "enemy alert list." Prior to the March 16 attack, Patterson had *not* placed Black on his enemy alert list and he never asked to be separated from him.[3] *Doc. 71, Ex. C, Ex. D at 36, Ex. E ¶¶ 4 & 6.*

4.     According to Patterson, about 3:00 p.m. on March 15, 2014, he and Black had an altercation in the barracks. Patterson subdued Black, who then said "ok it's over." *Id., Ex. A.* According to Patterson, he took Black at his word that the incident was "over." Because Patterson knew that prison "snitches get hurt," he did *not* make a report or alert any correctional officer about the incident with Black.[4] *Id., Ex. D at 36 & 40.*

5.     When Patterson went to bed at approximately 11:00 p.m. on the night of March 15, 2014, he believed everything was resolved with Black. *Id., Ex. A, Ex. D at*

---

[3]During the 18 years Patterson was incarcerated at the Varner Unit before the March 16 attack, he was involved in only one altercation with another inmate. After the incident, Patterson and the other inmate were separated and they were never housed together again. *Doc. 71, Ex. D at 45-47; Ex. E ¶ 8; Doc. 77, Ex. 11.* The other inmate involved in that altercation was *not* Black.

[4]None of the claims in this lawsuit involve the March 15, 2014 incident. *Doc. 71, Ex. D at 43.*

*28 & 40.*

6.     At 3:27 a.m. on March 16, 2014, without any warning, Black assaulted Patterson in his bunk, kicking him and hitting him by swinging a laundry bag that contained a boot. Most of Black's blows struck Patterson in the face. *Id., Exs. A, B & F;*[5] *Doc. 77, Ex. 7B.*

7.     At 3:38 a.m., Patterson walked from his bunk to the control booth, where he tapped on the window to alert Defendant Richard Mazzanti, the correctional officer on duty. *Doc. 71, Ex. F; Doc. 77, Exs. 3, 7A, 7B & 10.*

8.     Mazzanti immediately called for assistance. At 3:40 a.m., six officers entered the barracks, where they determined that Black was responsible for Patterson's injuries. At 3:45 a.m., the officers handcuffed Black. At 3:55 a.m., they removed him from the barracks. *Doc. 71, Exs. B, E ¶ 9 & F; Doc. 77, Exs. 3 & 7B.*

9.     Patterson was provided medical care at the prison but, due to the seriousness of his injuries, he was soon transported by ambulance to the Jefferson County Regional Medical Center. *Doc. 71, Ex. E ¶ 10.* As a result of his injuries, Patterson lost his left eye. *Id., Ex. D at 47-48.*

10.    After the March 16, 2014 attack, Patterson was transferred to another

---

[5]Exhibit F is a video showing the interior and exterior of Barracks 13. It covers the time period from approximately 3:25 a.m. through 3:55 a.m. and shows Black's attack on Patterson.

unit. Black was issued a major disciplinary violation and was added to Patterson's enemy alert notification list. Being placed on this list meant that Black and Patterson would never be housed together in the future. *Id., Ex. B, Ex. D at 33, Ex. E ¶ 3.*

11.    At the time of the March 16, 2014 attack, Defendant Andrews was the deputy warden of the Varner Unit; Defendant Bolden was a major at the Varner Unit; Defendants Bankston and Bradley were shift supervisors at the Varner Unit; Defendant Simpson was the sergeant assigned to Barracks 7-14 at the Varner Unit; and Defendant Mazzanti was the correctional officer assigned to Barracks 13 and 14. *Id., Ex. D at 25-26, 29 & 32-33; Doc. 77, Ex. 7B.*

12.    During the March 16, 2014 attack, none of the Defendants was present in Barracks 13; none of them witnessed the assault; and none of them participated in or encouraged the assault. *Doc. 71, Ex. D at 25-30, 32-33, 49, Ex. E ¶ 9, & Ex. F; Doc. 77, Exs. 3 & 6.*

13.    Under Varner Unit staffing guidelines in effect in March of 2014, one officer oversees Barracks 13 and 14. The ends of Barracks 13 and 14 are in alignment with each other, with the control booth located between them so that the officer on duty can observe both barracks. The duty officer normally is in or around the control booth. A hallway runs down one side of Barracks 13 and 14. The walls of Barracks 13 and 14 that parallel the hallway are made of glass to allow an officer walking the

5

hallway to see inside both barracks. The duty officer for Barracks 13 and 14 is also responsible for monitoring the hallway outside the barracks. *Doc. 71, Ex. D at 28 & 43, Ex. F; Doc. 77, Ex. 2.*

14.     The duty officer is required to perform a visual security check of Barracks 13 and 14 at least once every thirty minutes.[6] *Doc. 77, Exs. 2, 7B & 10.*

15.     During Defendant Mazzanti's shift on March 16, 2014, he performed visual security checks of Barracks 13 approximately every thirty minutes. At the time Patterson was attacked by Black, Defendant Mazzanti was either in the control booth or the hallway. *Id., Exs. 2 & 3*; *Doc. 71, Ex. F.*

16.     On March 16, 2014, after Black assaulted Patterson, a shift briefing investigation was conducted. This investigation revealed that all Varner posts, including the control booth post between Barracks 13 and 14, were properly staffed as required by ADC internal policies and American Correctional Association Standards. *Doc. 71, Ex. E ¶ 5.*

## II. Discussion

---

[6]The visual security checks are done from the control booth and hallway. For security reasons, a correctional officer is not allowed to enter a barracks alone. *Doc. 77, Exs. 1, 2, 3 & 7B.*

### A.    Official Capacity Claims

Patterson's claims for monetary damages, the only relief he seeks in this action, are asserted against each of the Defendants in *both* their "official" *and* "individual" capacities. *Doc. 1 at 4*. The doctrine of sovereign immunity precludes Patterson from obtaining monetary damages against the Defendants in their official capacities. *See Zajrael v. Harmon*, 677 F.3d 353, 355 (8th Cir. 2012); *Larson v. Kempker*, 414 F.3d 936, 939 (8th Cir. 2005). Accordingly, his claims against the Defendants, in their official capacities, should be dismissed, with prejudice.

### B.    Individual Capacity Claims

Qualified immunity protects government officials from liability for monetary damages in a § 1983 action unless their conduct violates a clearly established federal statutory or constitutional right that a reasonable person would have known. *Ashcroft v. Al-Kidd*, 563 U.S. 731, 736 (2011); *Saylor v. Nebraska*, 812 F.3d 637, 643 (8th Cir. 2016). To "overcome the defense of qualified immunity," Patterson must show that: (1) the facts, viewed in the light most favorable to him, demonstrate the deprivation of a constitutional right; and (2) the constitutional right was clearly established at the time of the deprivation. *Saylor*, 812 F.3d at 643; *Livers v. Schneck*, 700 F.3d 340, 350 (8th Cir. 2012).

The Eighth Amendment's prohibition against cruel and unusual punishment

requires prison officials to "take reasonable measures to guarantee" inmate safety by protecting them from attacks by other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). However, prison officials do not commit a constitutional violation every time one prisoner attacks another. *Young v. Selk*, 508 F.3d 868, 871 (8th Cir. 2007); *Blades v. Schuetzle*, 302 F.3d 801, 803-04 (8th Cir. 2002). Instead, to prevail on his failure to protect claim, Patterson must prove that: (1) objectively, there was a substantial risk of serious harm; and (2) subjectively, Defendants were deliberately indifferent to that substantial risk of serious harm. *See Holden v. Hirner*, 663 F.3d 336, 341 (8th Cir. 2011); *Young*, 508 F.3d at 872. An official is deliberately indifferent only if he or she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Keeping these principles in mind, the Court will now determine whether the facts, viewed in the light most favorable to Patterson, demonstrate that, at the time of the attack, there was a "deprivation of a constitutional right." To make that determination, the Court must consider whether: (1) there was "objectively" a substantial risk of serious harm to Patterson; and (2) "subjectively" the Defendants were deliberately indifferent to that substantial risk of serious harm.

8

Importantly, there is *no evidence* that any of the Defendants could have anticipated Black's surprise attack on Patterson. *See Doc. 71, Ex. E ¶¶ 6-9; Doc. 77 at 74.* Patterson and Black had lived together in the same barracks, without incident, for several months. Although they were involved in an altercation on March 15, 2014, Patterson thought the incident was resolved when he went to bed that night. He *admits* that he did *not* inform any of the Defendants of the March 15, 2014 incident, or ask that Black be placed on his enemy alert list or otherwise separated from him in Barracks 13. Thus, no one – *not even Patterson* – expected that, in the early morning hours of March 16, Black would launch a vicious surprise attack. After Patterson alerted Defendant Mazzanti that Black had attacked him while he was asleep in his bed, Mazzanti immediately called for help and six ADC officers responded in a matter of minutes. Patterson was immediately provided with medical care for his injuries and, due to their seriousness, he was taken to the hospital.

In short, objectively, there is *no evidence* of a substantial risk of serious harm to Patterson that *any* of the Defendants could have divined *before* Black launched his surprise attack. *A fortiori*, there is *no evidence* that any of the Defendants were deliberately indifferent to a substantial risk of harm that none of them had any reason to believe even existed.

The Eighth Circuit has repeatedly recognized that qualified immunity shields

prison officials from an Eighth Amendment failure-to-protect claim that arises from the prisoner being the victim of a *surprise attack* by another inmate. *Schoelch v. Mitchell*, 625 F.3d 1041, 1047-48 (8th Cir. 2010); *Tucker v. Evans*, 276 F.3d 999, 1001-02 (8th Cir. 2002); *Curry v. Crist*, 226 F.3d 974, 978 (8th Cir. 2000); *Jackson v. Everett*, 140 F.3d 1149, 1151 (8th Cir. 1998); *Prosser v. Ross*, 70 F.3d 1005, 1007 (8th Cir. 1995); *Smith v. Marcantonio*, 910 F.2d 500, 502 (8th Cir. 1990).

Patterson argues that Defendant Mazzanti was "inattentive" to his duties; was not paying attention to what was going on inside the barracks; often sat in the booth observing the hallway rather than the barracks; and did not always document security checks or make adequate security rounds. *Doc. 1 at 5-7, 10; Doc. 77 at 71*. He also argues that Defendants Simpson and Bankston failed to adequately train and supervise Mazzanti. *Doc. 1 at 6.*

There is no dispute that, at the time of the attack, Defendant Mazzanti was either in the control booth or the hallway outside of Barracks 13 and 14. Those are both places Mazzanti was supposed to be on his shift. Finally, Patterson's speculative allegations suggesting that Mazzanti was "not paying attention" at the time of the attack amount to, at most, claims that Mazzanti was negligent. Negligence, or even gross negligence, is insufficient to support a failure to protect claim. *See Pagels v. Morrison*, 335 F.3d 736, 740 (8th Cir. 2003); *Tucker,* 276 F.3d at 1002.

10

Patterson also makes the general assertion that the Defendants failed to provide adequate staffing and security, which increased the probability that he would be assaulted.[7] *See, e.g., Doc. 77 at 71-72.* But, he fails to address how even doubling or tripling the number of guards in the control room would have prevented Black (who had been involved in an earlier altercation with Patterson that *he* failed to disclose to guards so he could be protected from further retaliation) from launching the surprise attack at 3:27 a.m. on March 16, 2014, that resulted in Patterson's injuries.[8]

Finally, Patterson argues that the Varner Unit's policies themselves are constitutionally inadequate. However, to support that legal conclusion, Patterson cites no relevant and controlling legal authority and, instead, makes only the following conclusory allegations: (1) the Defendants failed to provide "adequate staffing to meet ... a constitutional minimum standard of supervision and surveillance"; (2) the

---

[7]To support this assertion, Patterson submits an affidavit, dated March 4, 2016, stating that he observed "many violent attacks, robberies, gambling, and homosexual activities" in the Varner Unit barracks. He also asserts that: Officers did not come into the barracks except "at count time"; Officers sometimes logged security checks without actually doing the checks; and "Most of the officers" sat in the control booth, where they were unable to see the entire barracks. *Doc. 77, Ex. 11.* He also submits affidavits from other prisoners about the failure of officers to log security checks or to enter the barracks except to do "counts." *Id., Exs. 4, 8, 9 & 12.* All of the facts contained in these affidavits relate to matters that are of *no relevance* to the issue in this case, which turns on Black's surprise attack on Patterson during the early morning hours of March 16, 2014.

[8]According to an affidavit from Warden Randy Watson, the Varner Unit was "properly staffed" on March 16, 2014, as required by all ADC policies and national accreditation standards. *Doc. 71, Ex. E ¶ 5.*

Defendants followed and "enforced" policies, procedures and practices that provided "inadequate and unconstitutional security in the barracks"; and (3) the Defendants knew one security officer was not sufficient to provide "adequate security and actual direct supervision" for two 54-man barracks, yet "allow[ed] the shortage of staff to go unchecked" and failed to ensure that security rounds were made *inside* the barracks. *See Doc. 1 at 6-7; Doc. 77 at 64-66, 70-74.*

Relying on *Smith v. Arkansas Department of Correction*, 103 F.3d 637 (8th Cir. 1996) and its progeny, Patterson argues that the Varner Unit policies, procedures and practices on staffing violated the following "clearly established constitutional minimums": (1) officers must always be present in the hallways for visual surveillance of the barracks; and (2) an officer must walk through the barracks at least once an hour at irregular times. *Doc. 77 at 11-12, 25-26, 70.*

In a factually similar case, the Eighth Circuit rejected a prisoner's almost identical arguments:

> *Smith* held that summary judgment was inappropriate when there was a factual dispute concerning whether prison officials were in compliance with a court order detailing the minimum requirements necessary for proper supervision in a particular open barracks. *Id.* at 648. In *Smith*, the unit at issue was under a specific order outlining the minimum requirements necessary for proper supervision and staffing in its open barracks. *See Finney v. Mabry*, 546 F. Supp. 628 (E.D Ark. 1982) (dismissing class action brought by inmates after finding that prison officials had sufficiently changed supervision procedures in the prison unit at issue to meet the requirements of the Constitution and a consent

decree). Evans and Norris are not under a specific order regarding staff and supervision requirements at the East Arkansas Regional Unit.

It appears the district court read *Smith* too broadly. *Smith* merely held that summary judgment was inappropriate where there were facts in dispute concerning whether the specific unit governed by the *Finney* order was following the requirements of that order. Here, on the other hand, there is no order governing the supervision policies of the unit and there is no evidence in the record that under-staffing at the East Arkansas Regional Unit has risen to the level of a constitutional violation. In sum, there is no evidence in the record demonstrating that Evans and Norris knew of and deliberately disregarded an excessive risk to inmate health or safety.

*Tucker*, 276 F.3d at 1002-03.

The Court's decisions in *Smith* and *Finney* were authored over two decades ago and addressed much different and far more dangerous open barracks policies and practices then in effect at the Cummins Unit of the ADC. Importantly, both of those cases dealt with the ADC violating specific court orders that were designed to bring the Cummins Unit's open barracks policies and practices into constitutional compliance. Because those decisions are legally distinguishable from and not applicable to Patterson's conclusory claim that the policies, practices and procedures for staffing the barracks at the Varner Unit, on March 16, 2014, were unconstitutional, they provide no legal support for his argument. *Cf. Cantrell v. Norris*, 2010 WL 3927792 (E.D. Ark. Oct. 1, 2010) (finding no deliberate indifference from a "surprise attack" in a Varner Unit barracks in 2005, where one officer was supervising four 50-

13

man barracks, in violation of ADC staffing policy), *aff'd* 433 F. App'x 488 (8th Cir. 2011).

Finally, even if the Court accepts Patterson's argument that a substantial risk of harm existed, on March 16, 2014, due to the inherently dangerous nature of the open barracks system at the Varner Unit, he has come forward with *no evidence* that, "subjectively," any of the Defendants were deliberately indifferent to that risk of harm. As discussed, on March 16, 2014, the Varner Unit was properly staffed in compliance with ADC regulations. In addition, the Defendants had no knowledge of any potential problems between Patterson and Black, nor any reason to anticipate that Black would assault Patterson while he slept in his bunk. *See Krein v. Norris*, 309 F.3d 487, 492 (8th Cir. 2002) (prison officials' lack of knowledge of a particular danger to an inmate is relevant to their subjective knowledge of the overall risk).

Thus, viewing the facts in the light most favorable to Patterson, there is *no evidence of a constitutional violation* arising from Black's surprise attack against Patterson on March 16, 2014. Accordingly, the Defendants are entitled to qualified immunity on all of the claims Patterson has asserted against them and their Motion for Summary Judgment should be granted.[9]

---

[9]Because there is no evidence of a constitutional violation, there is no need for the Court to address the second step of the qualified immunity analysis. *See Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004).

## III. Conclusion

IT IS THEREFORE RECOMMENDED THAT:

1.      Defendants' Motion for Summary Judgment (*Doc. 71*) be GRANTED.

2.      Patterson's claims against Defendants Bolden, Andrews, Bankston, Mazzanti, Simpson and Bradley be DISMISSED, WITH PREJUDICE.

DATED this 23rd day of August, 2016.

_____

UNITED STATES MAGISTRATE JUDGE